ROGER T. and DEBORAH S. FRITZ, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Fritz v. Commissioner
Docket Nos. 28387-84, 28389-84, 28390-84, 42188-85, 44500-85, 6597-86, 11944-86, 36166-86, 39020-86, 24000-87, 11273-88
United States Tax Court
T.C. Memo 1991-176; 1991 Tax Ct. Memo LEXIS 197; 61 T.C.M. (CCH) 2427; T.C.M. (RIA) 91176; April 17, 1991, Filed *197 Decisions will be entered for the respondent in docket Nos. 42188-85, 6597-86, 39020-86, and 24000-87. Decisions will be entered under Rule 155 in docket Nos. 28387-84, 28389-84, 28390-84, 44500-85, 11944-86, 36166-86, and 11273-88. Harold Miller, III, for the petitioners. J. Anthony Hoefer, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined that petitioners in these consolidated cases were liable for deficiencies in income taxes and additions to tax as follows: FRITZ, ROGER T. & DEBORAH S.
Docket No. 28387-84
Addition to Tax
Year
Deficiency
[2] Sec. 6653(a) 1976
$ 709   $ 35   (Roger only)
1977
11,973
599
(Roger only)
1978
33,395
1,670
(Roger only)
1979
51,552
2,578
1980
12,551
628
*198 Docket No. 42188-85
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
$ 10,101
$ 1,984
$ 505
*
Docket No. 36166-86
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1982
$ 4,623
$ 319
$ 368
*
Docket No. 11944-86
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1983
$ 1,148
$ 287
$ 57
*
Docket No. 42188-85
Year
Deficiency
Sec. 6659
1981
$ 10,101
$ 2,880
Docket No. 36166-86
Year
Deficiency
Sec. 6659
1982
$ 4,623
$ 1,387
FRITZ, WILLIAM J. & MARY LOU
Docket No. 28389-84
Addition to Tax
Year
Deficiency
Sec. 6653(a)
1976
$ 44,245
$ 2,212
1977
8,034
402
1978
39,606
1,980
1979
86,417
4,321
1980
33,374
1,669
FRITZ, WILLIAM J.
Docket No. 6597-86
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1982
$ 26,653
$ 6,613
$ 1,333
*
Year
Deficiency
Sec. 6654
1982
$ 26,653
$ 2,570
Docket No. 24000-87
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec.6653(a)(2)
1983
$ 31,277
$ 7,819
$ 1,564
*
*199 Year
Deficiency
Sec.6654
Sec.6661
1983
$ 31,277
$ 1,923
$ 7,819
FRITZ, GEORGE A. & BONNIE
Docket No. 28390-84
Addition to Tax
Year
Deficiency
Sec. 6653(a)
1978
$ 27,840
$ 1,392
1979
87,561  4,378  1980
29,474  1,474  Docket No. 44500-85
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
$ 145,940
$ 14,431
$ 7,297
*
Year
Deficiency
Sec. 6659
1981
$ 145,940
$ 16,417
Docket No. 39020-86
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6659
1982
$ 17,480
$ 874
*
$ 5,244
1983
19,223
961
*
4,882
SUTTLES, CHARLES R. & VIRGINIA A.
Docket No. 11273-88
Additions to Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6659
Sec. 6653(a)(1)
1979
$ 6,931
$ 347
$ 2,079
--
1980
6,969
348
2,091
--
1981
6,084
--
1,825
304
1982
19,642
--
5,893
982
1984
15,167
--
4,550
758
Year
Deficiency
Sec. 6653(a)(2)
1979
$ 6,931
--
1980
6,969
--
1981
6,084
* 1982
19,642
* 1984
15,167
* *200 Respondent also determined that the deficiencies for each petitioner constituted a substantial underpayment attributable to a tax-motivated transaction and that therefore petitioners were liable for increased interest under section 6621(d) (redesignated and herein referred to as section 6621(c)). After concessions, the issues for decision are: (1) Whether any portion of losses claimed by petitioners from their investments in master sound recording promotions is allowable; (2) whether any portion of investment credits claimed by petitioners from their master sound recording promotions is allowable; (3) whether George or William Fritz is entitled to any loss from alleged dealings in precious metals; (4) whether petitioners are subject to the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations; (5) whether the addition to tax for failure to file timely returns under section 6651(a)(1) is applicable in docket Nos. 44500-85, 42188-85, 11944-86, 36166-86, 6597-86, and 24000-87; (6) whether the addition to tax for valuation overstatements under section 6659 should be imposed in docket Nos. 44500-85, 39020-86, 42188-85, 36166-86, *201 and 11273-88; (7) whether the addition to tax for failure to pay estimated tax under section 6654 should be applied in docket Nos. 6597-86 and 24000-87; (8) whether the addition to tax for substantial understatement of income tax under section 6661 should be applied in docket No. 24000-87; (9) whether petitioners are subject to increased interest on substantial underpayments attributable to tax-motivated transactions within the meaning of section 6621(c); and (10) whether penalties should be awarded to the United States under section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. At the time they filed their petitions in these cases, Roger and Deborah Fritz, husband and wife, resided in Chico, California; George and Bonnie Fritz, husband and wife, resided in Norfolk, Nebraska; William and Mary Lou Fritz, husband and wife, resided in Columbus, Nebraska; and Charles and Virginia Suttles, husband and wife, resided in Eagle River, Alaska. William and George Fritz are brothers; Roger Fritz is William Fritz' son. Hereinafter the Fritzes and petitioner Charles *202 Suttles will sometimes be referred to by their first names and the Fritzes and the Suttles collectively as petitioners. Petitioners invested in master sound recording (MSR) promotions offered by Arthur P. Tranakos, an attorney who practiced in Atlanta, Georgia. (A "master sound recording" is a tape or other sound conveyance upon which a specific performance or program has been electronically recorded for use in the production of commercial audio products, such as records, tapes, and compact discs.) Tranakos offered the MSR promotions as prearranged investment packages. Each package provided for the purchase of an MSR on a deferred payment basis. At the time of the purchase, the purchaser executed a document assigning the proceeds from the commercial exploitation of the MSR to Tranakos as well as a distribution agreement with respect to the commercial exploitation of the MSR. Petitioners purchased one or more MSR's. The ostensible sellers of the MSR's were either a corporation called The Snuggery, Inc. or a Massachusetts business trust called Lex Terra Company. Tranakos was the president of The Snuggery; Lowell Anderson, an associate of Tranakos, operated Lex Terra. The Snuggery *203 and Lex Terra both acquired the rights to the MSR's in issue either from Four Ways Productions or from Southern Swamp Music, Inc. Jerry C. Wilson was the president of the latter two corporations. The dates of each purchase agreement, the seller of each MSR, and the artists performing on each of the MSR's at issue are as follows: Agreement
Petitioner
Date
Seller
Artist
George Fritz
12/3/79
The Snuggery
Conway Twitty
Bonnie Fritz
12/3/79
Lex Terra
Dennis Threalkill
Roger Fritz
12/3/79
Lex Terra
Dennis Yost
William Fritz
12/6/79
Lex Terra
Jimmie Rodgers
Mary Lou Fritz
12/6/79
Lex Terra
Jimmie Rodgers
Charles Suttles
12/31/82
The Snuggery
B. J. Thomas
Charles Suttles
12/27/83
The Snuggery
Faron Young
Each purchase agreement purported to convey an MSR to the purchaser together with the right to use, manufacture, promote, distribute, license, and package recordings from the MSR. In each of the five Fritz agreements (i.e., those agreements bearing a 12/3/79 or 12/6/79 date), the seller reserved the "right to use the individual performances on said Master in any manner, so long as said use is not in the exact configuration as the Master." The Suttles agreements *204 did not contain this provision. Neither the Fritz nor the Suttles agreements prevented the artist from recording a different version of the compositions appearing on petitioners' MSR's. The purchase price for each MSR was $ 250,000. Petitioners paid $ 10,000 in cash, and executed two notes for the balance -- a $ 15,000 note due in approximately 6 months, and a long-term note, with a term of approximately 10 years, for $ 225,000. The long-term note could be extended for an additional 10 years under certain conditions. The notes provided for interest at a rate of either 7 or 9 percent. The notes did not provide for fixed payments. Rather, the note would be "reduced" by semi-annual payments of the lesser of $ 1.00 per recording sold or 68 percent of the net profits from distribution or exploitation of the recording involved. In both the purchase agreement and the long-term promissory note that Charles Suttles executed in December 1983, the year of payment for his $ 225,000 obligation was left blank. Also, on the note, the date for exercising the option to extend it was left blank. Jerry C. Wilson, whose corporations had sold the MSR's to The Snuggery, also executed the distribution *205 agreements as president of the two distributors, Airways Music Distributors, Inc. or New Entertainment, Inc. Although the distribution agreements bore dates different from the purchase agreements, each of those documents was presented to, and executed by, petitioners at the same time. Airways Music Distributors, Inc. was the distributor for most of the MSR's at issue. For Charles Suttles' Faron Young MSR, however, Airways' name was scratched off the distribution agreements and replaced with the name "New Entertainment, Inc." None of the petitioners had a background in the recording industry. Tranakos was their sole source of information about their MSR's and the other entities involved, except for petitioner Charles Suttles, who also spoke with his accountant, Don Taylor. Each of the petitioners accepted the $ 250,000 price set by Tranakos for the MSR's without negotiation, making no attempt to go beyond Tranakos' assurances the MSR's were worth the amounts charged. None of the petitioners spoke with or met Jerry Wilson, who headed the distribution companies' offer; they did not attempt to seek a different entity to serve as their distributor. In the years following the purchase *206 of their MSR's, petitioners received statements from the promoters. Without exception, these statements reported small amounts of income, far less than that needed to pay off the debt incurred to acquire the MSR's. In the recording industry, MSR's are not themselves articles of commerce. Instead, they are part of the production process of finished commercial recordings. Even when they are sold, MSR's are almost always sold in large multiples, or "catalogues" -- often when a company is liquidating or changing its line of business. It is not commercially feasible to exploit a single MSR. Sales of individual MSR's are rare, unless the sale is taking place as part of a tax shelter promotion. The useful economic life for each of the MSR's at issue was no more than 3 years. The recordings that would be produced from these MSR's had little commercial appeal, and it was unlikely that retailers would display such recordings beyond a 3-year period. Based upon anticipated profits, none of the MSR's at issue had a value in excess of $ 5,000. Petitioners George and Bonnie Fritz
On December 3, 1979, George Fritz entered into an MSR agreement with The Snuggery, Inc. He purchased *207 an MSR called "Blue Is the Way I Feel," performed by Conway Twitty, a major country-western writer and recording artist. The songs recorded on the MSR were intended for demonstration purposes only, not for publication, and no valid publication rights were ever granted. Copyrights to the Twitty songs at issue belong to entities owned by Twitty. The title claimed by Four Ways Productions, The Snuggery, and, ultimately, by George Fritz, was invalid. The artistic and mechanical qualities of the Twitty MSR purchased by George was inferior to commercially marketable Conway Twitty recordings. Hence, the Conway Twitty MSR at issue has little commercial appeal; even if it had been augmented with more marketable songs and packaging, it would not have brought in more than $ 5,000 in gross receipts. George Fritz had no knowledge of the recording industry. He listened to part of the Conway Twitty recording, but otherwise relied on Tranakos to take care of "the record business." The copy he listened to was the only copy he ever saw. He had no knowledge whether the songs on his MSR had been previously released by Twitty. From the annual reports showing earnings of a few hundred dollars per *208 year, he assumed that efforts were being made to promote records from the MSR. At the time of trial in February 1989, George had no knowledge of the date payment was due on his $ 225,000 note. He could not recall the identity of the payee, even though he was required by the terms of the $ 225,000 note to make payment of that amount to Tranakos by June 1, 1989. He was unfamiliar with the individuals involved in either the sale of the MSR or in the distribution of recordings produced from that MSR. He did not independently verify his title. He deferred to Tranakos in all such matters. Before buying his MSR, George visited Gordon Goebel, an attorney in Fremont, Nebraska, who reported that the recording was a "legitimate purchase." Once he had invested in the MSR, George had Tranakos prepare his and his wife's joint income tax returns. He abandoned the certified public accounting firm that had previously prepared his individual tax returns. Beginning with tax year 1979, George filed Schedules C with his and his wife's joint tax returns. Therein, they reported the following items of income, expense, depreciation, and loss from their recording activity: Year
Income
Expense
Depreciation
Profit (Loss)
1979
($ 5,000)
$ 0    $ 33,000
($ 38,000)
1980
0 0
54,250
(54,250)
1981
406 0
40,688
(40,282)
1982
1,350 1,350
30,516
(30,516)
1983
350 350
22,887
(22,887)
1984
7,500 7,500
17,165
(17,165)
1985
1,750 1,750
12,874
(12,874)
1986
30 0
15,448
(15,418)
1987
0 684
12,873
(13,557)
*209 When record and tape sales proved to be below expectations, George would call Tranakos, and receive assurances that efforts to promote sales were being made. Tranakos, however, obtained an additional $ 500 from him to purchase "tape racks" to facilitate sales. On their 1978 tax return, George and Bonnie Fritz also claimed losses from George's alleged dealings in gold futures. On Schedule D, they claimed to have acquired the futures in August 1978, for $ 270,060, and to have sold them in September for $ 248,356, yielding a loss of $ 21,704. Bonnie Fritz executed purchase documents in December of 1979 to buy from The Snuggery an MSR by an artist named Dennis Threalkill. Unlike the other recording artists whose MSR's are at issue, Threalkill did not have a national reputation in country or popular music. Bonnie's situation was like that of her husband George; in matters concerning their purchase of the MSR's, "we didn't understand it so we turned it solely over to Art [Tranakos] to handle it." Bonnie Fritz filed a Schedule C with the tax returns she filed with her husband. Her Schedule C showed income, expense, depreciation, and loss from her recording activity as follows: Year
Income
Expense
Depreciation
Profit (Loss)
1979
($ 5,000)
$ 0    $ 33,000
($ 38,000)
1980
0 0
54,250
(54,250)
1981
750 0
40,688
(39,938)
1982
1,095 1,095
30,516
(30,516)
1983
400 400
22,887
(22,887)
1984
300 300
17,165
(17,165)
1985
2,118 2,118
12,874
(12,874)
1986
30 0
15,448
(15,418)
1987
0 684
12,873
(13,557)
*210 The 1981 joint Federal income tax return filed by George and Bonnie was not received by respondent until September 23, 1982. The date next to their signatures indicates that they signed the return on September 15, 1982. Tranakos signed the return as preparer, but he did not date his signature in the block provided. No one sought an extension of time beyond the April 15, 1982, date upon which George and Bonnie's 1981 return was required to be filed. William and Mary Lou Fritz
In December 1979, William and Mary Lou Fritz contracted separately for half of a double album, "Yesterday" and "Today", recorded by Jimmy Rodgers. William's contract purported to convey the "Today" songs; his wife's agreement was for the "Yesterday" songs. The seller was Lex Terra, which claimed to have acquired the MSR's from Jerry C. Wilson's Four Ways Productions. Four Ways did not have valid title to the "Today" productions; thus William received no valid title to the "Today" songs. Four Ways' interest in the "Yesterday" recordings was limited and late in arriving. On April 4, 1980, Robert Gentile, d.b.a. Scrimshaw Records, conveyed its interest in the "Yesterday" songs to Four Ways. Gentile-Scrimshaw *211 had acquired its interest from ABC Records, Inc., on May 1, 1978. That agreement only permitted Scrimshaw to sell vinyl long-playing records -- not tapes or compact discs -- through mail order solicitation or direct mail promotion. The "Today" songs had more of a country flavor than the "Yesterday" songs. None of the "Today" songs were commercially successful. If sold separately, potentially the "Yesterday" album would bring a maximum of $ 2,000 profits to the owner; the "Today" album would bring in profits of no more than $ 500. If the albums were combined, inclusion of the "Today" album would depress, rather than increase, sales of the "Yesterday" album alone; a combined album would bring the owner of the MSR total profits of no more than $ 2,000. Neither William nor Mary Lou knew about the promotion of musical recordings; instead, they relied upon Tranakos. They made no inquiries about Jerry Wilson, who had sold them the MSR's and agreed to distribute recordings therefrom. They did not know who would manufacture recordings from their MSR. They have not seen copies of any recordings from their MSR in a retail context. They did not ascertain whether either Tranakos or Jerry *212 Wilson had a background or a history of success in the recording industry. William was familiar with Jimmy Rodgers, whom he had heard on the radio singing on the "Grand Ole' Opry." William, however, could not name any of the songs on his MSR. At the time of trial, in February 1989, William had no idea of the outstanding balance due on his $ 225,000 note to Tranakos, although it was payable a few months later. William was not certain whether his MSR had a tangible physical existence, or was a collection of contractual rights. Like his brother George and son Roger, William had consulted with attorney Gordon Goebels in Fremont, Nebraska, and had received the same assurance that the investment seemed legitimate. William additionally verified that Tranakos was a licensed attorney at the time of the investment. He reviewed some of Tranakos' promotional materials. William reported his activity from the MSR program on his Schedule C included with the tax returns he and his wife filed for each year. Those schedules showed income, expense, depreciation, and loss in the following amounts: Year
Income
Expense
Depreciation
Profit (Loss)
1979
($ 5,000)
$ 0
$ 33,000
($ 38,000)
1980
0 0
41,750
(41,750)
1981
No Return
1982
2,865 2,865
30,516
(30,516)
1983
220 220
22,887
(22,887)
1984
4,780 4,780
17,165
(17,165)
1985
1,619 1,619
12,874
(12,874)
1986
31 0
25,747
(25,715)
*213 When sales did not meet expectations, William would meet with or talk to Tranakos about sales, and obtain assurance that the recordings would be promoted. William, too, forwarded another $ 500 to pay for tape racks. On his 1978 return, William claimed losses from alleged dealings in gold futures. William alleges that he acquired his futures in September 1978, and to have sold them in October 1978. His Schedule D did not list a figure for cost or sales price. His reported loss from the activity was $ 21,480. Mary Lou Fritz similarly reported her activity from the MSR program on a Schedule C she filed each year with her joint Federal income tax return. Those schedules showed income, expense, depreciation, and loss in the following amounts: Year
Income
Expense
Depreciation
Profit (Loss)
1979
($ 5,000)
$ 0
$ 33,000
($ 38,000)
1980
0 0
41,750
(41,750)
1981
No Return
1982
2,865 2,865
30,516
(30,516)
1983
220 220
22,887
(22,887)
1984
4,780 4,780
17,165
(17,165)
1985
1,619 1,619
12,874
(12,874)
1986
31 0
25,747
(25,715)
For investment credit purposes, William and Mary Lou reported their MSR's as new property having a useful life *214 of 7 or more years and costing $ 250,000 each, for a total investment of $ 500,000, and a total credit of $ 50,000. They used none of that credit in 1979. Rather, they carried the entire credit back to 1976 and 1977. Beginning with his tax return for 1979, William stopped using the accountant who had prepared his tax returns, and instead had Tranakos prepare the returns for himself and Mary Lou, showing the deductions and credits relating to the MSR investment. William and Mary Lou struck out the phrase "Under penalties of Perjury" from the jurat paragraph of the Forms 1040, U.S. Individual Income Tax Returns, that they prepared for 1982 and 1983. Additionally, William did not pay estimated income taxes for 1982 and 1983. For 1983, William had a tax liability of $ 31,277. Roger and Deborah Fritz
At the time he entered into the transactions at issue, Roger Fritz was 18 years old. Before Roger and his wife Deborah bought their MSR's, they visited (with Roger's uncle George) attorney Gordon Goebels in Fremont, Nebraska; he reported that the recording was a "legitimate purchase." In December 1979, Roger and Deborah entered into a purchase agreement with Lex Terra for a "Greatest *215 Hits" MSR recorded by Dennis Yost. Roger listened to the recording and reviewed some of Tranakos' promotional materials. Roger never met anyone from Airways Distributors, with whom he agreed to have the recording distributed. At the time of trial, Roger was not aware of the nature of the long-term $ 225,000 note he had executed, nor of the amount of his outstanding liability on that note. He could not explain the relationship between Dennis Yost, the artist who performed on Roger's MSR, and "The Classics IV," Yost's former singing group and the one with which Yost made his only successful releases. (Dennis Yost had been the lead singer of The Classics IV that had produced some "Top 10" hits in the 1960's and some other less successful releases in the early 1970's. Yost had not met with similar success as a solo performer.) Roger and Deborah's MSR included Yost's remakes of some Classics IV recordings as well as his version of songs previously recorded by other artists. An individual named Stephen A. Clark transferred the Dennis Yost MSR to Four Ways in December 1980, well after Four Ways allegedly assigned it to The Snuggery. The agreement between Clark and Four Ways did not *216 restrict Clark or Dennis Yost from rerecording the same songs for sale to, or through, other parties. The availability of other rerecordings of Dennis Yost and The Classics IV would have an adverse effect upon the commercial marketability of the MSR claimed by Roger and Deborah. Even with adequate marketing and promotion, it would have returned to them no more than $ 2,500 in profits. Beginning with his 1979 tax year, Roger reported his activity from the MSR program. He reported the following income, expense, depreciation, and loss from that activity: Year
Income
Expense
Depreciation
Profit (Loss)
1979
($ 5,000)
$ 0
$ 34,750
($ 39,750)
1980
0 0
54,813
(54,813)
1981
0 0
41,109
(41,109)
1982
450 450
30,270
(30,270)
1983
500 500
22,702
(22,702)
1984
700 700
17,027
(17,027)
1985
0 0
12,770
(12,770)
1986
0 0
25,539
(25,539)
For investment credit purposes, Roger claimed new property in 1979 having a useful life of 7 or more years and costing $ 250,000; this generated a total credit of $ 25,000 from the MSR. Roger claimed $ 1,728 of this credit in 1979, and he carried back the unused credit to 1976, 1977, and 1978, in the respective *217 amounts of $ 709, $ 11,973, and $ 10,590. Roger, like his uncle and father, changed return preparers; beginning with the tax return for 1979, Roger used Tranakos to prepare his and Deborah's tax returns. Also, like his uncle George, Roger telephoned Tranakos about the disappointing sales; Tranakos assured him that promotional efforts were under way. Tranakos also charged Roger $ 500 for racks to promote sales of the Dennis Yost recordings. Roger and Deborah Fritz' 1981 income tax return was filed on September 3, 1982. They received an extension of time until October 15, 1983, to file their 1982 return, but they did not sign that return until October 16, 1983. Respondent received that return on October 24, 1983. Their 1983 return was filed on October 15, 1984, in accordance with an extension of time to file by that date. Charles and Virginia Suttles
Petitioners Charles and Virginia Suttles heard of the MSR program through Don Taylor, a certified public accountant in Anchorage, Alaska. Petitioner Charles Suttles signed the MSR purchase agreement, the promissory notes, and the assignment of proceeds and distribution agreement for the B. J. Thomas MSR on December 31, 1982, *218 in Taylor's office in Anchorage. Although Tranakos allegedly signed the documents on the same date, he was not in Anchorage when Charles signed them. The recording by B. J. Thomas, purchased from The Snuggery, Inc., was entitled "Pretty Country Girl." Charles had heard B. J. Thomas' songs on the radio, had seen Thomas on television, and listened to a copy of the MSR before entering into the purchase agreement. None of the ten songs on Charles' MSR were among B. J. Thomas' successful releases. Thomas' recordings of the same songs sold to Charles had also been sold in separate MSR tax shelter promotions. The B. J. Thomas MSR had a current value of no more than $ 5,000. On December 27, 1983, Charles entered into an MSR purchase agreement for an MSR of Faron Young's recording, "Satisfied Mind." He had heard Faron Young sing on the radio, especially on a country and western program known as Louisiana Hayride. He listened to the Faron Young tape before entering into the purchase agreement. Faron Young, known as "The Sheriff," had been a popular country recording artist in the 1950's and 1960's. He had several releases that were top sellers in country music. Several rerecordings *219 of these successful releases are available for anyone who wishes to license them for commercial exploitation. In the 1980's, Faron Young had only limited commercial success. Other than rerecordings of his original hits, there is no practical commercial viability to new Faron Young recordings. Charles' MSR, moreover, consisted mainly of songs made famous by other performers. Even if adequately packaged and marketed, the MSR owned by Charles would return no more than $ 5,000 in gross income. Charles had no experience or background in the recording industry, music publishing, or distribution. He did not negotiate the price of the MSR, nor was he aware whether Don Taylor negotiated with Tranakos on their behalf. He never met Jerry C. Wilson, the distributor with whom they signed the distribution agreement. Charles was not clear whether Airways, headed by Wilson, and The Snuggery, headed by Tranakos, were the same entity. He was unaware of how many sales would be needed to pay off his liability to Tranakos. He relied upon Tranakos' advice that his recordings would make money; he did nothing to learn about the production and distribution of his product. Charles saw a television *220 promotion for an "Elvis" MSR, which he understood was being promoted by Tranakos. This reassured him that Tranakos could promote his product. Charles traveled to Atlanta where he found that Tranakos did indeed maintain a law office. He did not know how many tapes had been produced from his MSR's. In the case of the Faron Young MSR, the name of Airways as the distributor was scratched out in his distribution agreements and New Entertainment, Inc. was substituted. Charles, however, was not aware whether Airways and New Entertainment were separate companies. Charles conceded that he had not noticed that his "earnings" reports came from Airways, even though he had signed a distribution agreement with New Entertainment. He had heard that Jerry C. Wilson had dropped out of sight some time before trial, but he did not seek to have a new distributor engaged to promote his MSR's. At the time of trial, Charles was unaware of how he stood concerning liability on his long-term notes. Charles had not seen more than one retail copy of his tapes. Beginning with the initial year of his MSR investment, Charles had his tax returns prepared by Don Taylor, the promoter-salesman who presented *221 the MSR program to Charles and who served as his liaison with Tranakos. For 1982 and 1984, Charles reported his activities from the MSR programs on Schedules C, showing income, expense, depreciation, and loss in the following amounts: Year
Income
Expense
Depreciation
Profit (Loss)
1982
0
$ 10,000
$ 37,500
($ 47,500)
1984
$ 5,670
1,990
107,500
(103,820)
For investment credit purposes, Charles claimed the 1982 MSR as new property with a useful life in excess of 3 years, and costing $ 250,000. Of the $ 25,000 credit, Charles used $ 2,118 in 1982 and carried the remainder back to the taxable years 1979, 1980, and 1981. Charles inquired of Tranakos as to promotion and sales of retail products from the MSR's; Tranakos assured him that promotion and sales were doing fine. OPINION This is another master recording tax shelter case. In McCrary v. Commissioner, 92 T.C. 827, 848 (1989), we listed many such prior cases and stated: We have cited above the numerous master recording cases in which we have rejected similar contentions of taxpayers. We see no necessity to repeat here more excruciating analysis of the factors repeatedly discussed. *222 [Citation omitted.] This case presents nothing new to add to the well-worn arguments made, and rejected, in other master recording cases. Moreover, the pertinent facts of the transactions at issue are virtually the same. We therefore address the petitioners' transactions collectively. The first issue is whether any portion of losses that the petitioners claimed from their investments in the MSR promotions is allowable. Petitioners bear the burden of proving that they are entitled to the claimed deductions. Rule 142(a). In cases such as this, petitioners must show that they had a business purpose for engaging in the transaction other than tax avoidance, and that the transaction had economic substance beyond the creation of tax benefits. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. a Memorandum Opinion of this Court; Shriver v. Commissioner, 899 F.2d 724, 727 (8th Cir. 1990), affg. a Memorandum Opinion of this Court. The test thus generally entails "both the taxpayers' subjective business motivation and the objective economic substance of the transactions." Casebeer v. Commissioner, supra, 909 F.2d at 1363. *223 See Shriver v. Commissioner, 899 F.2d at 727. The courts to which this case may be appealed (the Eighth and Ninth Circuits) have both observed, "The consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of tax losses." Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. a Memorandum Opinion of this Court; Shriver v. Commissioner, supra, citing Sochin v. Commissioner, supra.
Business Purpose
The "business purpose" test involves the consideration whether a taxpayer had an "actual and honest profit objective" in engaging in the transactions at issue. Rose v. Commissioner, 88 T.C. 386, 411 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Jasionowski v. Commissioner, 66 T.C. 312, 321 (1976); see also Hirsch v. Commissioner, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. Section 162 *224 allows a deduction for "ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business." To constitute a trade or business under section 162, an activity must in the first instance be engaged in with an objective of making a profit. United States v. American Bar Endowment, 477 U.S. 105, 110 n.1, 91 L. Ed. 2d 89, 106 S. Ct. 2426 (1986); Polakof v. Commissioner, 820 F.2d 321, 323 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; Hirsch v. Commissioner, supra, see Flowers v. Commissioner, 80 T.C. 914, 930 (1983). Similarly, the deduction under section 212 of expenses for the production of income is dependent upon a profit objective. Bolaris v. Commissioner, 776 F.2d 1428, 1432 (9th Cir. 1985), affg. in part, revg. and remanding 81 T.C. 840 (1983). The same profit objective is necessary to obtain deductions for depreciation or to obtain the investment tax credit. Section 167(a) allows a deduction for depreciation only for property used in a "trade or business" or held "for the production of income." Section 48(a)(1), in turn, limits the investment *225 credit to property with respect to which depreciation (or amortization) is allowable. Hagler v. Commissioner, 86 T.C. 598, 622 (1986), affd. without published opinion sub nom. Dahlmeier v. Commissioner, 822 F.2d 63 (11th Cir. 1987); see Flowers v. Commissioner, supra.
We examined a master recording tax shelter in Flowers v. Commissioner, supra. There, in determining whether there was a profit objective, we took into account the taxpayers' ignorance of the recording industry, their failure to obtain valid information about the recording industry or to research the feasibility of entering the music business, their ultimate reliance upon the promoters of the shelter, their failure to negotiate over the purchase price offered, the lack of evidence of profitable returns, and the fact that the principal amount of the notes given to purchase the master recordings "greatly exceeded the value of the property acquired." We also noted the taxpayers' failure to spend any appreciable time or effort on the record business, their failure to obtain copyright registrations with respect to the master recordings, *226 and their failure to inquire into the ownership rights to such recordings. Those same factors convince us that here petitioners also lacked a profit objective in engaging in the transactions at issue. The most telling factor is the vastly inflated purchase price allegedly charged for the MSR's. The Ninth Circuit has stated that such an inflated purchase price is "Perhaps the most important single factor suggesting that the actual motive for the * * * activities was tax avoidance rather than even speculative profit." Independent Electric Supply, Inc. v. Commissioner, 781 F.2d 724, 728 (9th Cir. 1986), affirming a Memorandum Opinion of this Court. Here, we have found that the claimed purchase prices of the MSR's were $ 250,000 apiece, while the actual value of even the best of them never exceeded $ 5,000. Our findings that none of the MSR's at issue would justify a purchase price in excess of $ 5,000 is based substantially upon the report and testimony of respondent's expert Thomas Bonetti. Bonetti displayed considerable knowledge of, and experience with, all commercial aspects of the recording industry. He demonstrated a thorough knowledge of the artists, *227 an appreciation of the quality of the MSR's involved, and an understanding of the marketability of various products in the recording industry. [3] We accept his conclusions that the value of the MSR's in issue is adversely affected by their generally inferior quality, their problems with title, their lack of exclusivity, and various restrictions, such as ABC's restriction that the "Yesterday" album could only be sold by direct mail. Bonetti also testified convincingly as to the sales experience of other master recordings. He demonstrated *228 that some actual sales of MSR's include the CBS purchase of 500 MSR's in 1979 for $ 500,000. Another example was Monument Records' catalogue of 200 or 300 MSR's, including all the hits of known artists such as Roy Orbison, Kris Kristofferson, Boots Randolph, and others, and at least some hits by major artists such as Willie Nelson and Dolly Parton. This entire catalogue was sold for $ 850,000. The catalogue of MSR's owned by Ampex Corporation, consisting of 500 albums of classical material, sold for $ 50,000. In 1981, the catalogue of Janis Records, consisting of 100 to 150 MSR's, was acquired by Bonetti himself for $ 20,000. We are satisfied that the values we have determined for the MSR's represent the maximum values that can be justified. We do not accept the appraisals offered by petitioners' expert, Vito Blando. Although Blando has extensive experience in the recording industry, he has not justified sufficiently his endorsement of the values claimed by petitioners -- some $ 250,000 per MSR. Blando did not offer meaningful comparisons with the sales prices claimed. His written reports are merely vague summaries of optimistic developments -- such as a growing company disc *229 market -- that presumably would aid the sales of any given MSR. At trial, Blando compared the performances that might be obtained by the petitioners' MSR's with that of an MSR by the popular country recording artist Waylon Jennings. The only one of the petitioners' recording artists who shared comparable commercial success with Waylon Jennings was Conway Twitty. However, the Conway Twitty MSR offered by the Fritzes was of inferior artistic and mechanical quality to any commercially marketable MSR. The other factors outlined in Flowers are also present here. None of the petitioners demonstrated any meaningful knowledge of the recording industry; instead their exposure seems to have been restricted to listening to country music stations in Alaska (with respect to the Suttles) and Nebraska (with respect to the Fritzes). None of the petitioners obtained any independent information about the feasibility of entering the recording business, even though they were contemplating investing a quarter of a million dollars apiece. They only relied upon the promoters of the tax shelter. The Fritzes only obtained their advice from Tranakos, the attorney who sold them the program; and *230 the Suttles only talked to Tranakos and Don Taylor, the CPA who sold petitioner Charles Suttles his program. None of the petitioners negotiated the purchase price; rather they passively accepted the $ 250,000 price charged for each MSR, regardless of the performing artist or quality of the MSR involved. Nor have petitioners demonstrated that they had any reasonable basis for generating any profits from their MSR's. They failed to convince us that they were seriously concerned with the dismal economic returns upon their investments. In the 9 years he held his MSR, George Fritz reported income of $ 6,386, related expenses before depreciation of $ 18,934, and, including depreciation, overall losses of $ 244,949. For the same years, his wife Bonnie reported a loss of $ 307, related expenses before depreciation of $ 11,897, and, including depreciation, overall losses of $ 244,605. Roger Fritz showed losses over an 8-year period of $ 3,350, related expenses before depreciation of $ 1,650, and, including depreciation, overall losses of $ 243,980. William and Mary Lou Fritz filed identical Schedule C forms with their joint returns for the years 1979 through 1986. Each reported income *231 totalling $ 4,515, related expenses before depreciation of $ 9,484, and, adding in depreciation, overall losses of $ 188,907. In the two years before the Court, the Suttles reported income of $ 5,760 and net losses of $ 151,320. The picture shown by these results is one of consistent commercial failures. There was an appalling lack of income that would be needed to produce the $ 225,000 that each participating petitioner needed to repay the long-term notes he, or she, gave to Tranakos. None of the petitioners, however, reacted with alarm. At most, they made a few phone calls to Tranakos, and apparently he assured them that everything would work out. They also accepted the opportunity to pay $ 500 for some display racks for the recordings produced from the MSR's. We believe that a profit-seeking investor would do much more in terms of seeking a return, including demanding to see the books and records of the distributor, demanding an accounting of Tranakos' efforts on their behalf, and seeking to substitute a distributor who would show better returns. None of this happened. The fact that petitioners also switched tax return preparers further demonstrates petitioners' tax motivations. *232 All the petitioners abandoned the accountants who had previously prepared their returns in favor of the promoters who sold them the programs. After they purchased their MSR's, the Fritzes had Tranakos prepare their returns. For his part, petitioner Charles Suttles switched to Don Taylor, the CPA who sold the MSR programs to him. If the petitioners had been motivated by economic considerations, we doubt that switching tax services would have been necessary. None of the petitioners spent any appreciable time on the business. None independently investigated the title to the supposed $ 250,000 asset, although the underlying documentation often raised serious questions. Mr. Suttles claims to have ordered a commercial copy of one of his recordings from a record store, but as of the date of trial he had not received it, nor has he proved that the record he ordered was made from his MSR. None of the petitioners sought legal protection of their ownership interests in the MSR's. Nothing in the attitude of any of the petitioners shows the slightest resemblance to a serious investment of a quarter of a million dollars in a profit-generating enterprise. We are aware that William, George, *233 and Roger Fritz all consulted an attorney in Fremont, Nebraska, and that apparently all were informed that the investment was "legitimate." These petitioners have not demonstrated, however, that they provided that attorney with sufficient information about the programs to justify an unrestrained endorsement of their investments. Here, the record shows that, for the most part, the MSR's had deficiencies in title and in quality, and that their prices were nevertheless asserted to be $ 250,000. Additionally, the MSR's were used to generate tax credits of $ 25,000 and deductions of up to $ 38,000 -- all for an initial investment of $ 10,000. We doubt that any competent attorney, provided with these facts, would find the programs "legitimate." We are also aware that William Fritz checked to see whether Tranakos was a practicing attorney, and that petitioner Charles Suttles travelled to Atlanta and visited Tranakos' office. None of these activities, however, suggests that petitioners were assuring themselves of potential profitability. Indeed, in view of the promotions' paltry profits and enormous tax benefits, the most we can assume is that petitioners were making sure that Tranakos *234 was not going to disappear, and that perhaps some colorable basis existed for them to claim the tax benefits offered by the program. We have scrutinized the evidence, the testimony, and the demeanor of petitioners, and we are convinced that they were not motivated by any profit objective in buying their MSR's. The picture that emerges is one of taxpayers who sought, and claimed, substantial tax deductions by investing in a tax shelter. They hoped to play the "audit lottery" and escape with the minimal taxes over the 9-year period covered by the promotion. They have not succeeded. Economic Substance
The same factors that demonstrate petitioners' lack of a profit objective also convince us that, objectively, the MSR schemes lacked economic substance -- that is, the MSR's lacked any profit-making potential and existed only to generate tax benefits. We reviewed the factors that characterize an economic sham in Rose v. Commissioner, supra. There we stated: Key indicators of presence or lack of economic substance include presence or absence of arm's length price negotiations, the relationship between the sales price and fair market value, the structure *235 of financing of the transaction, whether there was a shifting of the burdens and benefits of ownership, and the degree of adherence to contractual terms. [88 T.C. at 410; citations omitted.] As is apparent, and as we further stated in Rose v. Commissioner, 88 T.C. at 414, applications of the "subjective" profit test share common characteristics with applications of the "objective" test of economic substance. See McCrary v. Commissioner, 92 T.C. at 844. Some of the "objective" factors set forth in Rose, however, provide extra weight to our determination that the transactions at issue lacked economic substance. For the sake of completeness, we address them briefly. The structure of the financing shows that the programs had no chance for a profit. Deferred debt that, in fact or in substance, is unlikely to be paid lacks economic substance. Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). We examine the substance of such *236 debt and are not guided solely by its form. Waddell v. Commissioner, supra.
Petitioners here financed 90 percent of the purchase prices by issuing long-term notes in the amount of $ 225,000. The notes had no requirement for annual or periodic payments. Before the 10-year period expired, there was merely a requirement to pay the lesser of one dollar per recording sold or 68 percent of the net profits from exploitation of the recordings. After the first 10-year term, each note could be extended for another 10 years, as long as petitioners met certain conditions, including payment of 50 percent of the indebtedness. The amounts of the purchase prices were vastly inflated -- in each instance, the note represented at least 45 times the fair market value of the MSR's for which they were given in payment. Although denominated as "recourse" notes, these notes are so commercially unreasonable that we do not believe that they were ever intended to be repaid. See Waddell v. Commissioner, supra.[4] The promoters instead utilized the notes only to inflate the tax basis of the MSR's involved in order to increase the amount of the investment *237 tax credits and subsequent depreciation.
Certainly the actions of petitioners support the conclusion that the long-term notes were not intended to be paid. Petitioners never made any direct payments on those notes. At trial, they could not give any indication of what their current liabilities were. They were unaware of the number of recordings that would have to be sold to satisfy their liabilities. They also seemed unfamiliar with the note provision requiring them to make payments of at least half of $ 225,000 after 10 years. Petitioners also failed *238 to demonstrate any meaningful change in the benefits and burdens of ownership. The MSR's in issue were purchased from Jerry Wilson's companies, Four Ways and Southern Swamp Music, and entrusted for sale to other entities he controlled. If Wilson had any serious belief that the recordings were worth a quarter of a million dollars, he would simply have retained the recordings and marketed them directly, rather than give up the profits that allegedly would be claimed by the Fritzes and Suttles. Flowers v. Commissioner, 80 T.C. at 935. Finally, petitioners have not demonstrated any degree of compliance with contractual terms. They allegedly bought the recordings, but then did nothing, with the possible exception of making a few phone calls and buying some display racks. For their part, the sellers did not, in a number of cases, deliver good title, and the distributors apparently did virtually nothing to promote the recordings made from the MSR's -- even if we accept the meager, but unfounded, income figures reported. [5]
*239 The promoters of the MSR programs have added nothing to convince us that the programs had economic substance. Tranakos testified, but his testimony as to the good faith operations of the programs was self-serving and unconvincing. In evaluating his testimony, we have noted the parties' stipulation that, since selling the MSR's at issue, Tranakos has been convicted of tax-related offenses in federal court in Wyoming, and disbarred from practice before this Court. And Jerry C. Wilson, the seller and distributor of the MSR's and their commercial recordings, has dropped out of sight. By the time of trial, he had been missing for some years. The foregoing factors -- the difference between actual values for the MSR's and those claimed for tax purposes, the lack of negotiation between the parties, the unrealistic financing, and the lack of any realistic investment activity on the part of the petitioners or their advisors -- convince us that the MSR transactions lack both a profit objective and economic substance. They are simply shams. They have no effect for tax purposes, and petitioners are not entitled to claim the losses and investment credits for the years in issue, including *240 those carryover years that the MSR losses and credits may have affected. Our determination that the transactions lack business purpose and economic substance removes any need to consider the other grounds for disallowance advanced by respondent. Losses in Gold Futures
For 1978, both George Fritz and William Fritz reported separate losses from dealings in gold futures contracts. As was the case with respect to their master recording shelters, they bore the burden of proving that the deductions arising from the claimed transactions were justified and were not shams. Sochin v. Commissioner, supra.We have set forth the principles to be applied in situations involving the taxation of dealings in futures contracts for precious metals in cases such as Ewing v. Commissioner, 91 T.C. 396 (1988); and Smith v. Commissioner, 78 T.C. 350 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987). Here, George offered copies of some "Swiss Gold Bullion Certificates" at trial. These apparently were gold futures contracts, showing a promised delivery of gold by a firm called C.H. Grant and Associates. *241 Both George and William offered purported confirmation statements, reflecting the credits of payment of slightly more than $ 20,000 by each of them to C.H. Grant and Associates. Neither George nor William, however, provided any meaningful explanation of the transactions. They produced no cancelled checks for the losses claimed. They failed to demonstrate a profit objective in entering the transaction. They failed to show, objectively, the existence of economic substance in the transactions. There is no basis for us to confirm that the gold purchase transactions set forth on their papers are, in fact, what they purport to be. On this record, George and William have not proved that the losses were allowable. Respondent's disallowance is sustained. Additions to Tax Under Section 6653(a)
Respondent determined that petitioners were subject to the additions to tax provided by section 6653(a) and section 6653(a)(1). That section provides an addition to tax equal to 5 percent of the underpayment if any part of any underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides an addition to tax equal to 50 percent of the interest *242 on the portion of the underpayment attributable to such negligence or intentional disregard. The Fritzes assert that the negligence additions should not be imposed against them because they relied upon Tranakos, who demonstrated an understanding of taxes. The Suttles further allege that they relied upon the advice of Don Taylor, who sold the promotion to petitioner Charles Suttles. These contentions, however, amount to "no more than inquir[ing] of the promoter if the investment was sound. Such reliance is not the type of activity which will overcome the addition to tax for negligence or intentional disregard of the rules and regulations." Rybak v. Commissioner, 91 T.C. 524, 565 (1988). The Fritzes also maintain that they consulted Gordon Goebels, an attorney, and got his approval of their MSR deals. But, as noted earlier, the deficiencies in the MSR's title and quality, the lack of a proven track record for the promoters, and the surreal financing would have warned off any competent attorney. Indeed, on the facts available, "No reasonable person would have trusted this scheme to work." Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), *243 affg. a Memorandum Opinion of this Court. At trial, some of the petitioners attempted to portray that they were unsophisticated and were misled into investing in the MSR programs. Based upon our observations of them at trial, we found just the opposite. Petitioners were shrewd and calculating. They were fully aware that, if they escaped audit, their MSR programs would produce an elimination of much of their tax liabilities for several years. We make an exception, however, in the case of Roger and Deborah Fritz. As between them, Roger was the moving party in their MSR investment. He was only 18 years old when he invested. It appears that he was merely following the lead of his father and uncle. Under these circumstances, his conduct does not warrant the imposition of additions to tax under section 6653(a). Addition to Tax Under Section 6659
Section 6659 provides, in pertinent part, for an addition to tax equal to 30 percent of an underpayment of tax attributable to an overvaluation of more than 250 percent in the value of property involved, or in the adjusted basis of such property. To incur the addition to tax, the underpayment must be at least $ 1,000. Here, the *244 most valuable MSR was worth no more than $ 5,000. Petitioners calculated their deductions and credits upon a claimed adjusted tax basis of $ 250,000 for each MSR. The latter figure is substantially more than 250 percent of $ 5,000. The disallowed credits were, in each case, some $ 25,000, and the initial disallowed deductions were close to $ 40,000 per return. In each of the years at issue, the deductions and/or credits generated underpayments that were substantially more than the required minimum of $ 1,000. Moreover, each underpayment was "attributable" to a valuation overstatement; the overstated basis of the MSR's is central to our decision that the tax credits and depreciation deductions based thereupon are invalid. Accordingly, the addition under section 6659 is properly imposed. Section 6621(c) -- Increased Interest
Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to "any substantial underpayment [exceeding $ 1,000] attributable to tax motivated transactions." A tax-motivated transaction specifically includes sham or fraudulent transactions. Sec. 6621(c)(3)(A)(v). The phrase "any sham or fraudulent transaction" *245 includes transactions that are without economic substance. Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). In addition, valuation overstatements, as defined in section 6659, also fall within the definition of tax-motivated transactions under section 6621(c)(3)(A)(i). We have determined that the transactions in issue were all shams, lacking economic substance, and, furthermore, that the MSR-related credits and deductions fall within the definition of valuation overstatements under section 6659(c). Respondent is entitled to the increased interest on the entire portion of the deficiencies relating to petitioners' investments in the MSR's, and, in the cases of William and George Fritz, in their investment in gold futures transactions. Miscellaneous Additions to Tax
Respondent determined *246 the late filing addition to tax for petitioners Roger and Deborah Fritz, William and Mary Lou Fritz, and George and Bonnie Fritz. Section 6651(a)(1) provides an addition to tax equal to 5 percent per month (not to exceed 25 percent) for each month after a return is required to be filed, but is not. Moreover, to be timely filed, the return must be a valid return. A taxpayer does not file a valid return when he strikes a portion of the jurat on his return, such as by crossing out the representation that he declares the entries to be true to the best of his knowledge "under penalty of perjury." Such a document will not be considered a return for purposes of avoiding the additions to tax under section 6651(a)(1). See sec. 6065; United States v. Moore, 627 F.2d 830, 834 (7th Cir. 1980); Beard v. Commissioner, 82 T.C. 766, 777 (1984), affd. per curiam 793 F.2d 139 (6th Cir. 1986); Schroeder v. Commissioner, T.C. Memo 1986-467. Roger and Deborah Fritz' return for 1981 was filed on September 3, 1982. The delinquency addition is properly applied for their 1981 year. Their 1982 return was signed on October 16, *247 1982, and filed on October 24, 1983, after the extended deadline for filing of October 15, 1983. A delinquency addition for one month is owed for 1982. We do not, however, sustain respondent's imposition of the delinquency addition against Roger and Deborah for the year 1983, because the return was timely filed before the extended deadline. At trial, William and Mary Lou Fritz submitted Federal tax returns for 1982 and 1983 upon which the "under penalties of perjury" jurat had been stricken. Those documents, therefore, were not valid returns. Accordingly, William and Mary Lou are liable for the delinquency addition for those years. George and Bonnie Fritz' 1981 income tax return was not filed until September 23, 1982. They did not seek to extend the deadline past the April 15, 1982 filing date. They too are subject to the delinquency addition to tax under section 6651(a)(1). Respondent also determined that petitioner William Fritz is liable for the addition to tax under section 6654 for the taxable years 1982 and 1983. As to the years in issue, the section 6654 addition to tax is mandatory unless petitioner comes within one of the exceptions to section 6654. Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). *248 There is nothing in the record to indicate that William Fritz made estimated income tax payments toward his tax liabilities or that he filed any estimated income tax returns. He has failed to show that he comes within any of the exceptions for filing estimated taxes, and respondent's imposition of the addition under section 6654 is sustained. Section 6661 provides that taxpayers who make a substantial understatement of income tax for any taxable year shall be liable for additions to tax equal to 25 percent of the underpayments attributable to such understatements. Section 6661(b) defines a substantial understatement to be any understatement that exceeds the greater of 10 percent of the correct tax or $ 5,000. See Pallottini v. Commissioner, 90 T.C. 498 (1988). Respondent's determination as to William and Mary Lou Fritz, which we have sustained, shows that their correct liability for that year was $ 31,277. William and Mary Lou's deficiency is therefore a substantial understatement within the meaning of section 6661, and the addition to tax imposed by that section applies to William and Mary Lou for the year 1983. Penalty under Section 6673
The final *249 issue is whether we should require petitioners to pay a penalty to the United States pursuant to section 6673 for proceedings instituted or maintained primarily for delay, or where petitioners' position therein is frivolous or groundless. At trial, we informed petitioners of our decision in Hawkins v. Commissioner, T.C. Memo 1987-233 (which involved the taxpayers' entitlement to deductions and tax credits attributable to their investment in a master recording program promoted by Tranakos), and warned them that sanctions might be imposed if we found that the master recording leasing transactions involved herein were similar to those found in Hawkins v. Commissioner, supra.
As previously stated, the transactions herein are virtually the same as those involved in numerous other master recording leasing programs, including those involved in Hawkins, supra, which we have found to be lacking in economic substance. We are convinced that these proceedings have been maintained by petitioners primarily for delay. Moreover, petitioners' position in these cases is groundless. Accordingly, in exercising our discretion, we require petitioners *250 to pay penalties to the United States pursuant to section 6673 as follows: Roger T. and Deborah Fritz - $ 5,000 William J. and Mary Lou Fritz - $ 5,000 George A. and Bonnie Fritz - $ 5,000 Charles R. and Virginia Suttles - $ 5,000 To reflect the foregoing, Decisions will be entered for the respondent in docket Nos. 42188-85, 6597-86, 39020-86, and 24000-87. Decisions will be entered under Rule 155 in docket Nos. 28387-84, 28389-84, 28390-84, 44500-85, 11944-86, 36166-86, and 11273-88. Footnotes
1. Cases of the following petitioners are consolidated herewith: William J. Fritz and Mary Lou Fritz, docket No. 28389-84; William J. Fritz, docket Nos. 6597-86 and 24000-87; George A. Fritz and Bonnie Fritz, docket Nos. 28390-84, 44500-85, and 39020-86; and Charles R. Suttles and Virgiana A. Suttles, docket No. 11273-88.↩
2. All section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded.↩
*. 50 percent of the interest due on the determined deficiency↩
3. Bonetti has testified before this Court as an expert concerning the value of master recordings in several other cases, including Rybak v. Commissioner, 91 T.C. 524 (1988); Avers v. Commissioner, T.C. Memo 1988-176; Secoy v. Commissioner, T.C. Memo 1987-286, affd. 869 F.2d 1498 (9th Cir. 1989); and McCain v. Commissioner, T.C. Memo 1987-285↩, affd. without published opinion (9th Cir. 1989).
4. Other instances in which we have refused to give effect to allegedly recourse notes in master recording situations occur in Maultsby v. Commissioner, T.C. Memo 1989-659; Diego Investors IV v. Commissioner, T.C. Memo 1989-630; Avers v. Commissioner, T.C. Memo 1988-176; McCain v. Commissioner, T.C. Memo 1987-285; and Tassistro v. Commissioner, T.C. Memo 1987-192↩.
5. We note, for example, that the Suttles reported income of $ 5,670 in 1984. We have no basis to believe that such income, which was allegedly "assigned" to Tranakos, represented anything other than the promoters' juggling of figures.↩